**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ANN SPACKMAN,**

**Plaintiff,**

**vs.** **Case No.:**

**ERIC K. SHINSEKI, SECRETARY,**
**DEPARTMENT OF VETERANS AFFAIRS,**

**Defendant.**

_______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**INJUNCTIVE RELIEF REQUESTED**

Plaintiff, Ann Spackman ("Spackman"), complains of Defendant, Eric K. Shinseki, Secretary, Department of Veterans Affairs ("Secretary"), as follows:

## JURISDICTION

1. This court has jurisdiction of the claims in this complaint pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq.;* 28 U.S.C. §1331; Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. §791; and Section 717 of the Civil Rights Act of 1964, as amended.

2. Plaintiff has satisfied all conditions precedent to filing of this suit or has been prevented by the Defendant from satisfying such conditions precedent or is excused under the law from satisfying any other conditions.

## PARTIES

3. Bay Pines VA Healthcare System ("Bay Pines") is a Veterans Administration ("VA") hospital and medical center with various community based outpatient clinics ("CBOC")

including the Fort Myers CBOC. Bay Pines was directed by a Medical Center Director, who at certain relevant times was Mr. Wallace Hopkins ("Hopkins"). At other relevant times, Bay Pines was directed by Suzanne M. Klinker ("Klinker"), who is the present director.

4. Spackman, a resident of Lee County, was employed by Bay Pines as a HUD-VASH social worker from November 26, 2009 to the time of her separation effective in November, 2012. Spackman primarily worked out of the Fort Myers CBOC.

## GENERAL ALLEGATIONS

5. Spackman engaged in protected EEO activity including, *inter alia*, her complaints to ORM; her three formal complaints of discrimination and retaliation (Form 4939) including Case No. 200I-0516-2011104425 filed on September 27, 2011, Case No. 200I-0516-2012101817 filed on May 10, 2012 and Case No. 200I-0516-2013102005 filed on May 31, 2013 and related hearing requests; her complaints to her supervisors and other VA officials about and opposition to the sexual harassment of her by a patient; her objection and opposition to the failure of the VA to properly address that sexual harassment and her requests that the sexual harassment be addressed; and her objections to and opposition to the discrimination and retaliation against her and the hostile work environment.

6. On multiple occasions from the period of December 15, 2010 through July 12, 2011, Spackman was sexually harassed and threatened by a VA patient (sometimes referred to herein as the "patient" or the "stalker"). Among other things, the patient became sexually fixated on Spackman; told her he masturbated to thoughts of her; called her answering machine to listen to her voice; called 10-20 times a day; made sexually inappropriate comments to her such as "you fucking whore" and "you hot little girl"; became irrationally jealous of her attention to other patients; indicated his belief that she was his angel; showed up unannounced at her

appointments with other patients; left pornography all over his apartment at scheduled home visits; expressed the belief they were meant to be together; pressed her with unwanted gifts; named his dog (presumably a "bitch") Annie (after Spackman) and threatened to poison the dog when he was angry with her; tried to take his pants off in the car she was driving; told her she had a sexual addiction; accused her of staring at men's crotches; and accused her of allowing male veterans to change their clothes in the car while she was there. The patient's behavior escalated throughout the above mentioned time period to the point where the patient was also physically threatening Spackman. The patient told her, "I'm going to go to the VA, shoot you and then shoot myself," and "I won't be on this earth much longer, I'll see you in heaven." When the patient was finally transferred away from her, the patient became angry and told her he would go to the press; would have her job; and would go to the director, supervisor, press, and the President of the United States with complaints about her. The patient was ultimately convicted of stalking Spackman.

7. Although Spackman notified her supervisor, Patricia Kovack, and others on multiple occasions about the sexual harassment, her requests to put a stop to the sexual harassment were ignored by her supervisor and other management officials and VA employees who were aware of the harassment. Spackman received no support, and no or insufficient action was taken. Rather, actions and omissions were taken against her, including the discriminatory and retaliatory conduct set forth below.

8. Spackman worked closely with volunteer service organizations. In appreciation of the veterans and her work with them, the organizations donated $5,000 to be used at Spackman's discretion to meet the HUD-VASH veterans' needs. In recognition of this accomplishment, Spackman's supervisor said she was going to put Spackman in for an award

around the end of May, 2011 or early June, 2011, but never did after Spackman raised concerns about the patient.

9. Spackman's supervisor refused to let her transfer or terminate the patient even when she made such requests after the patient threatened her life.

10. On multiple occasions Spackman's supervisor did not address her concerns regarding the patient's sexual harassment of her.

11. On multiple occasions Spackman was told by her supervisor not to put relevant clinical information concerning the sexual behavior of the patient in the progress notes, including because "other staff could read it."

12. On multiple occasions Spackman told her supervisor that her stress level was extremely high (Spackman was diagnosed with chronic PTSD), which was ignored. For example, her supervisor did not mention the Employee Assistance Program until after the patient was incarcerated on July 13, 2011 (for stalking Spackman) or offer any other help.

13. On June 27, 2011, Spackman asked her supervisor if she should go to the police and was told not to and that the supervisor would "handle it" the next day which the supervisor did not do.

14. On June 29, 2011, the patient's misconduct towards Spackman escalated. When Spackman expressed fear for her safety to her supervisor, the supervisor still kept insisting on postponing the transfer of the patient until July 8, 2011, nine days later.

15. On June 30, 2011, Spackman raised with her supervisor the possibility that Spackman obtain an injunction against the patient, which was recommended by the police. Spackman's supervisor advised against it. Later that day Spackman's supervisor again advised

Spackman not to seek an injunction because it "might upset the patient" and she (the supervisor) purportedly had the patient "calmed down."

16. On June 30, 2011, Spackman's supervisor told Spackman that Spackman was being removed her from peer-to-peer, which was a program Spackman was responsible for in the southern clinics, so that the patient could remain a participant.

17. After Spackman told her supervisor she was filing for an injunction against the patient, the supervisor said that she spoke with Mary Levenson, Chief of Psychology, and threatened that they may remove Spackman from her clinical duties while they investigate the patient's accusations against her, which accusations were patently false, part of the harassment, and originally reported by Spackman.

18. Spackman's supervisor said that a behavioral flag should not have been put on the patient's chart and wanted to leave the issue to the Bay Pines committee.

19. Spackman's supervisor kept demanding that Spackman put notes in the computer when she knew Spackman's computer had been broken for over a week and offered no assistance on how to do so.

20. On multiple occasions Spackman's supervisor improperly berated Spackman for properly sending clinical information (concerning another patient) to a partnering agency and falsely claimed that Spackman did not have proper releases and did not follow protocol. The supervisor threatened that she and others were going to have a meeting over Spackman's purported misconduct. In fact, this issue was taken all the way to the Chief of Mental Health before anyone even checked to see that Spackman had a proper release. Moreover, meetings were held about this issue from which Spackman was excluded, and apparently inquiries were made about it without first interviewing Spackman in violation of VA and Privacy Act rules.

Rather than do anything about Spackman's safety and her expressed fear for her safety, Spackman was criticized and apparently investigated for conduct that was completely proper.

21. The measures taken by the VA were not sufficient to stop the patient's threatening behavior and to ensure Spackman's safety. Throughout this process, Spackman's supervisor dismissed Spackman's complaints, falsely implying that Spackman was narcissistic and the patient's preoccupation was not about her.

22. On July 1, 2011, after Spackman informed her supervisor that she was taking off work due to stress and anxiety caused by the patient's harassment and the hostile work environment, the supervisor proceeded to upset Spackman further by telling her about calls the supervisor had received from the patient. Further, the supervisor called Spackman's home at 9:00 a.m. and 1:30 p.m. about work related issues including again berating Spackman about the release issue.

23. On July 6, 2011 Spackman's supervisor:

A.) falsely denied ever having told Spackman she was considering removing Spackman's clinical privileges and launching an investigation;

B.) falsely denied having threatened to remove Spackman from peer to peer; and

C.) made a veiled threat that she knew a social worker who was investigated and that, "it was really awful."

24. On July 12, 2011, after Spackman filed for FMLA and clearly advised her supervisor that the stress was work related, the supervisor continued to make calls to Spackman's home about work. Further, she never advised Spackman of leave options until August 2, 2011.

25. On July 15, 2011, Spackman's supervisor called and told Spackman that because Spackman was on FMLA, the supervisor was rescinding Spackman's approved authorized absence for a conference in July which was already approved.

26. After Spackman complained on July 15, 2011, about her supervisor calling her at home while on FMLA, her supervisor pressed a colleague of Spackman's to have Spackman call the supervisor about work.

27. On July 15, 2011, Spackman received eight calls from Rick Merillat (a VA social worker), Lt. Wilkins (a VA police officer) and George Donnell (EMS) about the location of the keys to Spackman's work car which Spackman had not driven that month. Spackman called everyone back on July 16, 2011, a Saturday, and told them where the keys were. Mr. Donnell asserted they did not find the keys where Spackman said she last put them and hung up on her.

28. Although Spackman's attorney sent a letter on July 25, 2011, requesting that all correspondence be addressed through her, VA staff continued to address Spackman rather than Spackman's attorney for the period from July 25, 2011 to October, 2011.

29. After Spackman filed an EEO complaint, her attorney was contacted by Tonya Burton, a VA attorney, on August 5, 2011. Ms. Burton was insulting, rude and confrontational, and made the following inappropriate and harassing remarks:

A.) She stated that the VA had no responsibility to Spackman's case and that "there was nothing to resolve."

B.) She made remarks to the effect that Spackman's issue was a matter for law enforcement, and the VA did not have any obligation to assist her.

C.) She strongly and threateningly implied that Spackman failed to determine that the patient was inappropriate for Spackman's program, and Spackman was therefore an unqualified employee.

D.) She dismissed the notion that the VA took no prompt, remedial action in this matter.

E.) Although she was repeatedly asked what safeguards the VA had taken, she did not provide a response.

F.) Despite repeated requests for the VA to deal directly with Spackman's attorney, she stated that she could not comply with this request.

G.) She maintained that Spackman was expected to receive every telephone call from VA management despite being out on FMLA.

30. The VA's ORM representative, Mr. Lennox, engaged in the following improper and harassing conduct as Spackman attempted to make an EEO claim:

A.) He was extremely rude and condescending.

B.) He told Spackman on August 12, 2011, that she did not have a claim for sexual harassment because she was not sexually harassed by her supervisor and the VA had no responsibility to her.

C.) He said that the behavioral flag placed on the patient's chart was a sufficient response to Spackman's safety issues;

D.) He refused to file Spackman's complaint of discrimination.

E.) When Spackman contacted Mr. Lennox and attempted to file a retaliation claim, he falsely told her that she had to wait until her other claims were addressed.

31. From July 12, 2011, to September 23, 2011, there had been no mention by anyone in the VA that Spackman needed to return her laptop. On Friday, September 23, Spackman's supervisor left two messages inquiring for the first time about her laptop. Her message stated that all electronic equipment needed to be returned after 90 days of leave and asked that Spackman call her or call Mark Gulash, an IT Specialist. Spackman was granted leave beginning July 12, 2011, and it was still under 90 days of leave. The VA had been notified as far back as July 25, 2011, that Spackman was on leave and that they were to contact her attorney in her absence. Spackman was further harassed concerning this laptop as follows:

A.) On September 30, 2011, Spackman's attorney left messages for Mr. Peter Zeh, a Bay Pines HR Specialist, and Spackman's supervisor offering to assist with the return of Spackman's laptop to which they never responded.

B.) On September 26, 2011, the administration caused the VA police to call Spackman to inquire as to the whereabouts of the laptop.

C.) On September 28, 2011, Spackman's attorney spoke with Ms. Burton who threatened to issue a written order disciplining Spackman for theft of company property.

D.) On September 28, 2011, Mr. Zeh falsely alleged that Spackman had ignored written communication from her former supervisor, concerning returning the computer.

E.) On September 30, 2011, Mr. Zeh falsely accused Spackman of withholding federal property (i.e. the laptop), and argued, "Why would you even keep that laptop anyway? Why would your boss have to call your lawyer, are you suing the VA?" Spackman understood the reference to suing the VA as expressing a threatening disapproval of Spackman filing an EEO complaint.

F.) On October 1, 2011, Spackman received a letter from L. Harrison Reeder, the Social Work Chief, dated September 26, 2011, postmarked September 29, 2011, falsely stating that in June Spackman failed to return her laptop and air card and that it was imperative that she return the equipment by close of business September 30, 2011.

32. On September 30, 2011, Mr. Zeh incorrectly and rudely stated to Spackman that her leave was miscalculated and if she did not return to work on October 3, 2011, she would be considered AWOL, which could result in her termination although that was not the correct return date. In making this threat Mr. Zeh was hostile and confrontational. Spackman was intimidated and emotionally upset and his conduct required Spackman to contact her attorney. Spackman told Mr. Zeh that she had not received anything notifying her of any date change, and he falsely claimed that Spackman's supervisor had called her about this.

33. On October 4, 2011, Ms. Burton shouted at Spackman's attorney stating she would only communicate with Spackman's attorney about her discrimination charge and no other information about Spackman's employment would be forthcoming.

34. On or about October 4, 2011, a voicemail was left on an answering machine which appeared to be Tanya Burton, another woman referred to as Karen and an unidentified

man laughing and making fun of Spackman. In addition, it appeared that someone intimated Spackman was going to lose her job.

35. On October 5, 2011, Mr. Reeder told Spackman to "put the legal stuff aside." Mr. Reeder also said words to the effect that it was a shame that this had to go through the EEO process. He further stated, "I have never seen two lawyers not take a situation and make it more confusing than when two people just talk things out" and that he felt that as clinicians, they needed to be able to communicate. Spackman understood Mr. Reeder's comments to be expressing threatening disapproval of Spackman having filed an EEO claim and having hired an attorney to help her pursue her EEO claim.

36. On October 5, 2011, Mr. Reeder offered Spackman a Fort Myers Mental Health position which was a demotion. Moreover, he misrepresented that it was a G-12 position when it really was a GS-11 position.

37. On October 5, 2011, Mr. Reeder falsely stated that neither he nor Spackman's former supervisor were aware of any safety issues regarding Spackman.

38. On October 5 and 7, 2011, Mr. Reeder tried to make Spackman feel guilty about having other people provide coverage in her absence.

39. During a phone call on October 11, 2011, Mr. Reeder engaged in the inappropriate harassing, intimidating and threatening conduct, including, *inter alia,* the following:

A.) He presented himself as a nine year police veteran and proceeded to discount the advice of the police who had helped Spackman.

B.) He said that "criminals look to retaliate" which Spackman interpreted as a threat.

C.) He compared being stalked to being hunted after sharing that he was a hunter which Spackman took as an effort to frighten her.

D.) He stated that if Spackman were alone on her job she would be considered, "prime game" in what Spackman perceived was another attempt to frighten her.

E.) He said that all that would need to happen was for the patient to know where Spackman got her work vehicle. He said that as far as being a moving target, he was a professional shooting instructor and he knew that you adapt your style so that you can take the prey down and compared this to his hunting deer.

F.) He said that he understood the mentality of stalking and that he did not put "too much stock in the legal system" because he knew that they release people early and that they tend to be more reactive than proactive.

G.) He kept saying that "we've got to get your life back together" and that by Spackman being "locked up in her house it would shrink the state of her life and that concerned him."

H.) He said that Spackman's last name does not sound like "old money from New Jersey or something" and that Spackman probably needed to work which Spackman considered a threat about her job.

I.) After telling Spackman that it was up to her if she felt comfortable working in mental health and at the clinic, he then directed that Spackman had to show up there Monday at 8:00 a.m. for the Fort Myers Mental Health position which was a demotion.

40. On October 11, 2011, Mr. Reeder stated he would provide a functional statement so Spackman could request reasonable accommodations, but failed to do so.

41. On October 18, 2011, the administration had only offered Spackman a GS-11 position although there was a GS-12 position available.

42. On October 19, 2011, Spackman was told by a colleague that in a staff meeting Mr. Reeder said that he was grilled by two IG inspectors and made fun of Spackman's safety issues by saying that they had no sense of humor and that when this was over he never wanted to hear the word safety again.

43. In an effort to avoid giving Spackman her job back and to make reasonable accommodations, on October 19, 2011, Mr. Reeder and a VA attorney said it was a job requirement in HUD-VASH to escort patients to their appointments at the Fort Myers CBOC and attend these appointments with them which had never been true.

44. On October 19, 2011, Mr. Reeder said that Spackman could not keep her job because he was now modeling HUD-VASH after another program which excluded her.

45. Spackman requested to return to her job with reasonable accommodations including the ability to telework, temporarily not having to go to the Fort Myers CBOC, an altered tour to permit counseling and medical appointments, and a take-home vehicle, all on a temporary basis until the patient could be reassessed and Spackman was confident of her safety. On November 1, 2011 this request was denied or not accepted during a phone conference.

46. During the November 1, 2011, phone conference, Mr. Reeder and a VA attorney cited a purported national/federal mandate which allegedly precluded permitting any take home vehicles, but they never provided a copy of the alleged mandate although they had agreed to do so. It is believed that no such mandate exists, and VA Directive 7239 directly contradicts what they asserted.

47. On November 1, 2011, Spackman was offered a position at the Naples CBOC as a mental health social worker. In this position, Spackman would no longer be able to make medical appointments because she had no leave and had not been provided with the information she had been told she would be given regarding an altered tour. Further, Spackman's lawyer was advised that Spackman would be responsible for her own safety at the Naples CBOC, even though a VA attorney had previously told Spackman's lawyer that the Naples clinic was not safe because it had no security. Spackman was told that the position they were offering was

temporary which no one in administration would verify. The VA was inappropriately attempting to make Spackman take a position with trauma patients when she was working with her own PTSD issues.

48. On December 16, 2011, Spackman was admonished by Dr. Ravindran, Fort Myers Chief of Mental Health and Violence Prevention Team Member, for adding her name as an additional signer to a note Spackman wrote seeking more intensive care of and transfer of the patient to a more appropriate program.

49. The VA failed to follow its reasonable accommodations policies and procedures. Its lack of cooperation in providing answers, responses, functional statements, mapping information, policies, and forms dragged the process out for five months, most of which Spackman was on leave without pay. For example, after considerable delay and contrary to VA policies and procedures, on December 14, 2011, Spackman was provided an "Employee Request for Reasonable Accommodation Based on Non-Work Related Injury/Illness".

50. On December 29, 2011, Spackman requested the official reasonable accommodation packet from Peter Zeh which was not provided.

51. In a letter dated December 29, 2011, from Rhonda L. Gero, Assistant Human Relations Officer, to Spackman:

a. Spackman was given seven days to respond which would be January 11, 2012. Spackman was directed to return to work at the Fort Myers CBOC before her response was due even though her physician and the police had advised her against going to that clinic and despite the fact that she did not feel safe there.

b. The letter incorrectly asserted that Spackman "recently informed" the VA of her need for accommodation in her position. The VA was informed on August 5, 2011 of Spackman's need for reasonable accommodation. National VA Handbook 5975 recognizes that the VA's failure to process her accommodation requests in less than thirty days could constitute undue delay in violation of the Rehabilitation Act.

c. Spackman was provided with two purported "reasonable accommodations" options, both of which were not reasonable.

52. In other letters or communications, Bay Pines improperly failed to provide Spackman with reasonable accommodations. In addition, Bay Pines failed to follow proper procedures with respect to Spackman's requests and need for reasonable accommodations.

53. Until approximately January 25, 2012, Spackman was not returned to her position or any position and had not been given any appropriate position since her FMLA leave concluded on October 12, 2011.

54. When Spackman returned to HUD-VASH on January 25, 2012, she was unable to work because she did not have a laptop and was told by Mark Gulash, a Bay Pines IT specialist, that her name had been removed from the computer system and that she did not have VPN access despite having been told by Heather Nichols that a laptop would be provided to her upon her return. When Spackman was provided a laptop in February, 2012, she was unable to utilize the laptop because she was not provided access until March 8, 2012. She was not provided a cell phone, CPRS, or VISTA access and RESCUE until March, 2012. Brian Stine, a Bay Pines IT specialist, told Spackman that he was instructed by administration to delay providing computer access to Spackman. Other staff members were provided electronic equipment and computer access before Spackman although Spackman had made a request for the equipment and computer access before them.

55. After returning to work on January 25, 2012, Spackman was not provided notice of staff meetings, which she would normally attend.

56. On January 31, 2012, Mahshid Alishahi, Social Work Supervisor, sent an email to HUD-VASH staff telling staff to begin transferring all of Spackman's cases back to Spackman.

There was no communication from Mahshid to Spackman about her instructions regarding transferring patients to Spackman, and Spackman did not have a computer, cell phone, CPRS access, or VISTA password to be able to work with patients.

57. On February 2, 2012, Spackman requested in an email that Supervisor Gwen Regan provide her with a list of upcoming meetings so that Spackman could attend. Spackman was not provided a meeting list for seven weeks.

58. On February 6, 2012, in a staff meeting with Mr. Reeder, Ms. Regan, and others, Mr. Reeder presented the meeting as a venue to discuss transferring Spackman's caseload back to her, but no cases were transferred back to her. Moreover, Mr. Reeder made humiliating, demeaning and inaccurate comments and intimations about and to Spackman. Further, he indicated he was going to impose work duties on Spackman which he knew or should have known Spackman could not undertake as a result of Bay Pines refusing to provide reasonable accommodations and Bay Pines not appropriately considering and handling Spackman's safety concerns and medical condition.

59. On February 8, 2012, Spackman informed her supervisor that she was afraid of the patient who was convicted of stalking her. Spackman again requested to pick up her work vehicle at a location other than the Fort Myers clinic. Spackman did not receive a response until over a month later after the stalker had been readmitted to the HUD-VASH program.

60. Bay Pines employed a number of techniques that prevented Spackman from applying for Workers' Compensation in a timely manner.

61. In a February 10, 2012 email, Ms. Regan stated that she needed to "investigate the emails sent from the VISN announcing various teleconferencing calls" in response to Spackman's request for meeting schedules. Ms. Regan did not request that Spackman be added

to the HUD-VASH mailing list until March 13, 2012, which is the forum in which many of these meetings were announced.

62. In a February 13, 2012 email, Ms. Regan notified Spackman of an upcoming VISN 8 conference call scheduled for February 15, 2012. However, although Spackman requested it, Ms. Regan did not provide Spackman with the VANTS phone number and conference code to participate.

63. In a February 15, 2012 email, Ms. Regan asked Spackman to work out of the Vet Center despite her knowing Spackman felt safest teleworking.

64. In a March 1, 2012 phone call with Ms. Regan, Spackman was informed that she was going to have to provide coverage for a staff member in Naples despite Ms. Regan's awareness that Spackman had IBS.

65. In the March 1, 2012 phone call with Ms. Regan, Spackman was informed that Mr. Reeder had reviewed her cases and thought it was best that some of her caseload not be returned to her for undisclosed "sensitive reasons" which she said she was not at liberty to discuss. No other case managers had been treated in this manner.

66. Ms. Regan did not advise Spackman of various meetings and did not respond to emails from Spackman asking Ms. Regan if there was anything she wanted Spackman to do while she waited for the computer.

67. On March 13, 2012, Ms. Regan informed Spackman of a decision to take away her tour at the end of the week because a staff member was going out on maternity leave.

68. On March 13, 2012, Spackman again requested telework information and a schedule of the group meetings which were not provided. Spackman was inaccurately told by Ms. Regan that staff meetings are not usually scheduled in advance.

69. On March 13, 2012, Spackman learned that the patient who had harassed her and had been convicted of stalking her was admitted back into HUD-VASH in Fort Myers. In addition to adding to the hostile work environment and constituting acts of discrimination and retaliation, admitting the patient back into the HUD-VASH in Fort Myers was inappropriate and harmful to Spackman for numerous reasons, including, *inter alia*:

a. This was decided several weeks prior by administration.

b. Spackman was not included in any discussions or aware of this plan.

c. Spackman was not warned by administration.

d. Spackman was informed by her colleagues that they unanimously were against having the veteran who stalked Spackman readmitted into HUD-VASH and said that the decision was made because the stalker was angry and still focusing on her.

e. Spackman was told by several colleagues that the case managers had unanimously opposed the patient's readmission to the program and wanted to join forces to stop this readmission. The case manager, who Spackman had been told was forced to take this patient over his objections, said, "No, the decision has been made, there's nothing that we can do, it was made very high up the chain."

f. Spackman was informed that it was also recommended by case managers that this patient participate in a program called Housing First in lieu of HUD-VASH that had availability in Pinellas County, but that administration refused to consider it.

g. It was reported to Spackman that Mr. Reeder said that he was admitting the patient into Fort Myers HUD-VASH to "put out fires" (the stalker was continuing to say bad things about Spackman). This gave credence to this patient's delusions which made him more dangerous to Spackman.

h. The decision to place the stalker in closer proximity to Spackman disregarded her safety and medical condition and put the patient at greater risk to fail by reoffending and violating probation.

i. The patient was readmitted to the program March 12, 2012 and the following morning Ms. Regan told Spackman that they were removing Spackman's altered tour. The altered tour had helped Spackman to better manage her stress. Doing this at the same time they admitted the stalker

into the program where Spackman worked exacerbated her PTSD and IBS symptoms.

j. The patient was voicing angry complaints about Spackman which indicated that he was still focusing on her and potentially volatile. A more reasonable plan would have been to allow this veteran to go to the DRRTP (two phase program lasting multiple months) where he could be observed over a period of time and a more accurate assessment of his dangerousness and preoccupation with Spackman could be made.

k. Bay Pines had many resources for homeless veterans. Among other things, it had 755 HUD-VASH vouchers throughout southwest Florida and many programs and resources other than HUD-VASH.

l. Probation Officer Oscar Ferrer tried multiple times to reach Ms. Regan by phone to express concerns about the danger of putting Spackman in the same county with the stalker in the same program Spackman worked in. He also wanted to express that he felt that it was unwise to place Spackman in a clinic with no security and that he felt that allowing the veteran back into HUD-VASH in Fort Myers was setting the patient up to fail by violating his probation. Ms. Regan never returned his phone calls.

70. On March 13, 2012, Spackman received an email from Ms. Regan at 1:57 p.m. stating, "Here is one of the training calls" which was scheduled at 2:00 p.m. that same date.

71. On March 21, 2012, Spackman's attorney sent a letter to Ms. Regan regarding safety issues and never received a response back.

72. On March 23, 2011, Spackman received a message from Ms. Regan at her home falsely intimating that Spackman had misappropriated car keys for a work vehicle.

73. Although other staff timely received W-2 forms, Spackman's W-2 form was unnecessarily delayed.

74. On April 9, 2012, Spackman received an email from Ms. Regan stating that Carrie Meo-Omens was now handling HUD-VASH. Ms. Meo-Omens had been appointed the supervisor on March 29, 2012, but no one told Spackman until April 9, 2012.

75. On April 12, 2012, Spackman attended a conference call with Ms. Meo-Omens and Rhonda Gero, Tanya Burton and Spackman's attorney. During the call Spackman was repeatedly given a "direct order" by Ms. Meo-Omens that Spackman report for work Monday, April 16, 2012 at the Port Charlotte CBOC at 8:00 a.m. Although this assignment was not safe for Spackman and Spackman was terrified of the patient who stalked her, Ms. Meo-Omens refused to discuss safety issues. During the phone conference Ms. Burton made inappropriate comments, was rude and yelled at Spackman.

76. In an April 12, 2012 letter to Ms. Meo-Omens, Spackman's attorney raised concerns from the telephone conference call on April 12, 2012 in which Spackman was ordered to work at the Port Charlotte CBOC. These concerns included, *inter alia,* safety and medical issues, including Spackman's IBS which made the commute problematic. The issues raised in the letter were not addressed appropriately.

77. On April 12, 2012, Ms. Meo-Omens sent Spackman a letter issuing a direct order that Spackman report to work at 8:00 a.m. on Monday, April 16, 2012. Ms. Meo-Omens did not address any of Spackman's safety concerns or IBS issues and gave other unfair and harassing directions.

78. On April 13, 2012, Spackman emailed Ms. Meo-Omens and raised several concerns, including, *inter alia*, safety and health issues, to which Ms. Meo-Omens did not respond.

79. On April 16, 2012, the air card for Spackman's computer was not working and Spackman was again unable to access CPRS or VISTA because she had been removed from the system again and was unable to charge her cell phone because she was never given a charger.

80. On April 16, 2012, Ms. Meo-Omens gave Spackman a list of her newly assigned caseload, nine of which were located in Fort Myers. This would require an additional two hour commute daily, making the total commute four hours a day based out of Port Charlotte which was not possible with Spackman's IBS. Ms. Meo-Omens had stated that caseloads were decided based on the geographic location of the patients. The caseload assigned to Spackman did not make sense geographically.

81. Two people assigned to Spackman's caseload were two of the veterans that lived in the building that the stalker used to live in. The stalker knew the HUD-VASH veterans in this apartment complex which made Spackman more traceable and therefore at greater risk. Ms. Meo-Omens had deliberately failed to tell Spackman (or the stalker's probation officer) that she was having Spackman manage veterans in the apartment complex the stalker had resided in. Further, the stalker was moved back into the same apartment complex.

82. On April 16, 2012, Spackman again told Ms. Meo-Omens about her concern regarding the commute and IBS.

83. On April 16, 2012, Ms. Meo-Omens asked if Spackman was sure if she really want to keep working there because, "You know this will never stop" (referring to the retaliation against Spackman).

84. On April 16, 2012, Ms. Meo-Omens told Spackman that Bay Pines and surrounding sites had 755 HUD-VASH vouchers, 195 of which were in Port Charlotte, Fort Myers, Sebring and Naples. Consequently, Ms. Meo-Omens was aware that there were many other options for the patient who stalked Spackman other than the Fort Myers HUD-VASH program.

85. On April 16, 2012, Ms. Meo Omens told Spackman that the patient who stalked her was offered HUD-VASH in St. Petersburg or Bay Pines and agreed to go, but later demanded that he return to the Fort Myers HUD-VASH program where Spackman was supposed to work. Ms. Meo-Omens said the patient was being non-compliant. Consequently, Ms. Meo-Omens was aware that the patient was continuing to stalk Spackman.

86. Ms. Meo-Omens falsely stated and reiterated that the VA had to admit the stalker into HUD-VASH in Fort Myers because, "they cannot deny a veteran services." Spackman had made more appropriate recommendations for this veteran which were all ignored. Moreover, a veteran is not entitled to services at a particular location after having engaged in misconduct. Further, offering him HUD-VASH in another county is not denying this veteran service nor is offering him another program denying him service.

87. Spackman was never given a key to the Port Charlotte CBOC annex which is locked at all times. Spackman asked the PSA if she could have a key and was told that supervisors were supposed to place requests prior to an employee starting their assignment, which had not been done. Further, Spackman was never provided a passcode to the alarm system despite requests to both the PSA and her supervisor. This was dangerous to Spackman concerning the stalker and problematic for Spackman's IBS.

88. On April 17, 2012, Spackman was informed by Port Charlotte staff that administration was well aware of the issue of lack of space and that they currently have 26 employees, 22 seats and only six offices. Spackman's telework was removed and no reason provided. Spackman was left to sit on a recycling bin next to a trashcan, and she put her laptop on a file cabinet. Spackman was told that Port Charlotte staff was upset when Spackman had arrived because of the space issues. Spackman was told by a staff member, "People will be

bitchy with you because we don't have the space for another person. I would just tell them it is not your fault."

89. On April 17, 2012, Spackman was informed by Port Charlotte staff that six staff members were allowed to pick up their work vehicles in Fort Myers and drive to the Port Charlotte clinic. They had also been allowed to subtract the drive time from their regular tour. This was never offered to Spackman.

90. On April 17, 2012, Spackman's attorney sent an an email to Ms. Mulcahy again objecting that "Ms. Spackman works in an unsafe and frightening environment at a substantial increase in expense and personal discomfort to her."

91. Ms. Gero solicited reports of contact about Spackman from Spackman's colleagues on Spackman's second day back to work on April 17, 2012, erroneously painting Spackman as not working.

92. On April 18, 2012, after an hour commute, Spackman had to bang and yell on the Port Charlotte CBOC door for approximately one minute trying to gain access to the bathroom because she was never given a key. During the time Spackman was excluded from the clinic she had an IBS accident outside. She was extremely humiliated, particularly because people from all over the office complex were staring at her.

93. Following the April 18, 2012 IBS accident, Spackman sent Ms. Meo-Omens an email requesting leave for April 19 and April 20, 2012, to which Ms. Meo-Omens replied, "Thank you." However, Spackman's request for LWOP was denied and she was ultimately charged as AWOL.

94. In an April 19, 2012, email, Ms. Meo-Omens told Spackman that "requesting leave via email is unacceptable" although Spackman had been previously told by Mr. Reeder that

she could request leave by email and she had been doing that with numerous supervisors for over six months without any complaints.

95. On April 20, 2012, Spackman contacted Ms. Meo-Omens at her request by phone and was told that she was rejecting Spackman's request for leave despite Spackman having told her that she had been having severe IBS symptoms since April 19, 2012 and could not make the commute that day. Ms. Meo-Omens said that she was putting Spackman down as AWOL for April 19 and 20, 2012, and she would be contacting HR to discuss disciplinary actions against Spackman.

96. On April 27, 2012, Spackman attended two conference calls to discuss reasonable accommodations with Karen Mulcahy, Rhonda Gero, Ms. Meo-Omens, and Spackman's attorney. During these two calls, among other things, reasonable accommodations were improperly not offered to Spackman; Spackman's needs were ignored and not fairly considered; erroneous statements were made about Spackman and her abilities; Spackman's medical condition was minimized; Spackman was subjected to humiliating and intrusive questions about her medical condition; Spackman was badgered with inapplicable and unfair hypothetical situations; inaccurate statements and rationales were given to Spackman concerning her placement, safety and other issues; Spackman was falsely accused of violating HIPPA; Spackman's comments were repeatedly distorted; attempts were made to make Spackman feel guilty including the absurd and extremely abusive suggestion that she was purportedly responsible for leaving suicidal vulnerable patients without care; and Spackman was falsely accused of not working. For this and other reasons, the conference call became so abusive that Spackman's attorney had to end it.

97. Beginning April 18, 2012 and continuing to the time of her removal from the VA, Spackman was unable to work in Port Charlotte as a result of, *inter alia,* her PTSD and IBS. Spackman's PTSD and IBS were caused, *inter alia,* by the inappropriate behavior of the stalker, the inappropriate acts and omissions by Bay Pines concerning the stalker, the hostile work environment and the discrimination and retaliation against her.

98. On May 2, 2012, Spackman was offered a position at the CBOC in Port Charlotte or Naples as a purported reasonable accommodation. The VA, including Ms. Meo-Omens, knew that Spackman could not commute to the locations because of her PTSD and IBS. Ms. Meo-Omens also knew, *inter alia,* that such a commute would substantially reduce Spackman's effective pay; increase her commute time; and that Regional Counsel had previously indicated such positions would not be safe for her. Other employees were reimbursed for the expense of the commute and receive benefits for the time of the commute.

99. By letter dated July 13, 2012, Mr. Reeder improperly proposed to separate Spackman from her employment as a HUD-VASH social worker at Bay Pines for medical inability to perform. Spackman was fully able to perform the functions of her job medically, and Mr. Reeder failed to give the real reason for proposing termination.

100. Mr. Reeder's letter proposing Spackman's separation was sent after a 49 day period of silence while Spackman was being charged AWOL without pay from Bay Pines since her last response to Rhonda Gero on May 25, 2012.

101. Mr. Reeder threatened to terminate Spackman for medical reasons although Bay Pines had not heeded Spackman's medical provider's recommendations.

102. The VA's true authority and responsibility under 38 CFR, Part 17 was to not reoffer the patient who stalked Spackman services in Fort Myers HUD-VASH. Christine Brown,

Rhonda Gero, Karen Mulcahy, Ms. Meo-Omens and Mr. Reeder distorted 38 CFR, Part 17 as an excuse to readmit the stalker into the HUD-VASH program Spackman worked in by presenting it as only addressing medical services although it also applies to "any other services" including HUD-VASH.

103. George Van Buskirk was responsible under 38CFR, Part 17 but did not apply due diligence and allowed a safety decision to be treated as a clinical issue made by social work.

104. On May 2, 2012, the VA's representative responded to Spackman's attorney's April 19 and 20, 2012 letters specifically raising safety and stalking, but did not address stalking and ignored all safety recommendations.

105. In a seventeen month period Spackman was only allowed 8 hours paid official duty time which did not nearly reflect the hours she spent on conference calls, responding to emails, letters, meeting with the director, etc. which all other participants were compensated for.

106. Mr. Reeder's termination letter said that Spackman could ask for additional paid administration time to respond but when she asked for additional time, he denied Spackman's request and stated that it was policy to grant 8 hours of AA to assist in a response and ignored Spackman's August 1, 2012 request of said policy.

107. Spackman wrote three times to Mr. Reeder, "I have never been offered or granted AA to compensate for time writing letters, conference calls or other responses before. In addition, I would like to request eight hours AA for my May 25, 2012 response to Ms. Gero's May 16, 2012 letter. I would have requested this before but was not informed of the policy." Mr. Reeder never responded to these requests and Spackman was not granted any additional time.

108. Ms. Patricia McGann, a HUD-VASH Supervisor, was told on June 12, 2012 (her second week of work) by Ms. Meo-Omens that Spackman was sexually harassed and "She asked for it."

109. Ms. Meo-Omens told Ms. McGann that Spackman dressed very inappropriately and repeatedly said that her being sexually harassed was Spackman's "fault" and that she had "asked for it."

110. Ms. Meo-Omens only disparaged Spackman to Ms. McGann and never made a single positive comment about Spackman.

111. Ms. Meo-Omens told Ms. McGann that Spackman had PTSD and then smirked and rolled her eyes (implying that Spackman did not have PTSD).

112. Ms. Meo-Omens improperly shared Spackman's diagnosis and her belief that Spackman would never be returning to work with a person who was, at that time, a total stranger and had no reason to be told this information.

113. Ms. McGann confronted Ms. Meo-Omens at a later date about her discomfort with Ms. Meo-Omens blaming Spackman. Ms. Meo-Omens falsely told her that this was important background information and that Ms. McGann needed to have this information as background to do her job.

114. Spackman was not provided official duty time and pay for a September 4, 2012 meeting with Director Klinker and a five hour commute although everyone else at that meeting was being compensated. Their failure to provide paid administrative time for this meeting caused Spackman to become ineligible for unemployment.

115. Klinker only offered Spackman the option of a social work position as a demotion in the clinic where her stalker was receiving services. Otherwise, Spackman would be terminated.

116. By letter dated October 26, 2012 from Klinker, Spackman was separated from the VA for medical inability to perform, which was false.

117. In the reasonable accommodation process, if the Agency is not able to provide Spackman an equivalent position in her field, it is required to allow her the option of a position in another field which was never raised despite her repeated attempts to raise it.

118. Spackman has incurred attorney's fees and legal costs as a result of the foregoing conduct and events.

**Pattern, Practice and Culture of Retaliation**

119. The Defendant has engaged in a pattern and practice of retaliation and hostile retaliatory work environment and has maintained a culture of retaliation and hostile retaliatory work environment and has allowed a culture of retaliation and hostile retaliatory environment to be maintained at Bay Pines with respect to Equal Employment Opportunity ("EEO") activity, including making EEO complaints, participating as a witness on behalf of other parties' EEO complaints and objecting to or opposing discriminatory and retaliatory conduct.

120. For many years various high-ranking administrators, managers and supervisors at Bay Pines have punished employees or permitted or overlooked the hostile treatment of employees who made EEO complaints or who objected to or opposed discrimination or retaliation. Such administrators have attempted to deter the making of EEO complaints by retaliating against or overlooking retaliation against employees who have made EEO complaints or have opposed discrimination or retaliation. For example, Dr. Van Buskirk, the former Chief

of Staff, and Dr. Lin, the former Chief of the Medicine Service, with the knowledge, assistance and support of Hopkins, decided to and attempted to deter the filing of employment complaints by retaliating against those who engaged in EEO activity. To this end Lin and Van Buskirk, with the actual or tacit support of Hopkins, undertook a course of retaliation against numerous Bay Pines employees for engaging in EEO and other protected activity, including, *inter alia*, Dr. Diane Gowski, Dr. Claudia Cote, Dr. Sally Zachariah, Dr. Ramon Lopez, Dr. Jacques Durr, Dr. Robert Mandelkorn, Ms. Sabrina Patrick, Ms. Roxanne Lainhart Bronner, Dr. Selim Elzayat, Dr. Valpersia Gainers-Hasugluw, Ms. Pamela Trimle, Dr. Michel Vandermael and Dr. David Johnson. Such retaliation included, by way of example, various types of discipline and proposed discipline, including termination, suspension, reprimand and counseling; denying leadership positions; changing duties and office assignments; seeking information to discipline and terminate employees; seeking out employees to assist in gathering derogatory information about employees, including the solicitation of reports of contact, which are written complaints by one employee against another and are used as a basis for steps in discipline; spying on employees; using unjust criticism and criteria and withholding awards until an employee agrees to provide information derogatory of other employees; rifling through employees' files and documents; creating and maintaining false records about employees; removing employees from committees; reducing or limiting physician's medical privileges and credentialing; subjecting physicians to inappropriate fitness-for-duty exams; failing to follow required procedural requirements for adverse or disciplinary actions; subjecting employees to lower evaluations, inappropriate bonuses and increasingly higher levels of discipline up to suspension without pay and termination; and using committees to insulate the administrators from appearing to have engaged in discriminatory or retaliatory conduct.

121. As part of the pattern, practice and culture of retaliation and hostile retaliatory work environment, various administrators, managers and supervisors at Bay Pines have developed and maintained a reputation for retaliation against those who engage in EEO activity or do not join in their efforts to insulate their management style including their willingness to retaliate.

122. As a result of the pattern, practice and culture of retaliation and hostile retaliatory work environment, a fear of retaliation has developed at Bay Pines. As a result, a number of very good employees are afraid to come forward with information they have concerning discriminatory or retaliatory conduct and a number of very good employees have chosen to leave Bay Pines.

123. As part of the pattern, practice and culture of retaliation and hostile retaliatory work environment, concerns about retaliation are ignored and not investigated. Such conduct, omissions and failure to investigate reflect a continuing disregard of the laws and rules concerning retaliation, serve to intimidate, cause fear that retaliation will not be addressed and will be tolerated at Bay Pines, and maintain the culture of retaliation and a hostile retaliatory work environment.

124. In July, 2009, following a jury trial in the U.S. District Court for the Middle District of Florida (*Fiedler, et. al. v. Eric Shinseki, Secretary, Department of Veterans Affairs*; case number 8:07-cv-1524), a jury found that Bay Pines had retaliated against three doctors and an administrative officer for EEO activity and awarded damages to the plaintiffs. The complaint alleged, and the case was presented and argued as involving a systemic scheme at Bay Pines perpetrated by Hopkins, Van Buskirk and Lin to retaliate against employees who engaged in EEO activity in order to punish those employees and to deter others from engaging in EEO

activity. On November 23, 2009 the federal court in that case entered an order declaring that "there is no showing permitting a conclusion that the discriminatory conduct will not recur or that the circumstances have changed such that the effects of the retaliatory hostile work environment [at Bay Pines] have been eliminated" and that "[i]ndeed, it appears that no changes have been made at all at Bay Pines VA in response to the verdict in this case." The court's order also granted injunctive and equitable relief including enjoining Bay Pines from "continuing or maintaining any policy, custom, usage or practice of retaliation, retaliatory harassment, or retaliatory hostile work environment" at Bay Pines and ordered "remedial instruction on work place discrimination, with particular focus on retaliation and retaliatory harassment in the work place, and hostile work environment for, *inter alia*, Hopkins, Van Buskirk and Lin.

125. Despite the foregoing verdict and November 23, 2009 federal court order, Bay Pines or the VA has engaged in conduct and omissions since the verdict which reflect a continuing disregard of the laws and rules concerning retaliation, serve to intimidate, cause fear of retaliation; and cause fear that retaliation will not be addressed and will be tolerated at Bay Pines, and maintain and further the culture of retaliation and retaliatory hostile work environment.

126. Hopkins publicly stated that he felt there were a lot of EEO's at Bay Pines and he wanted to stop them and therefore was not going to settle any. In addition, at a meeting in or about April or May 2009, Hopkins told Police Service managers and supervisors not to worry about employee claims because he would always support managers, not employees. In addition to constituting direct evidence of retaliation, such comments by administrators and by managers are themselves intimidating, cause fear of retaliation, create a hostile retaliatory work environment, and maintain the culture of retaliation and retaliatory hostile work environment.

**Count I**
**(Discrimination based on sex)**

127. Plaintiff, Ann Spackman, sues Eric K. Shinseki, as Secretary of the Department of Veterans Affairs for discrimination based on sex under Title VII.

128. Plaintiff incorporates and realleges paragraphs 1 through 126.

129. As a direct and proximate result of the foregoing conduct and adverse actions, Plaintiff has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of sex (female). The aforesaid adverse employment actions, adverse actions, misconduct and omissions to the Plaintiff's detriment were all taken (or failed to be taken) by administrators and managing and supervisory personnel with Bay Pines because of Spackman's sex.

130. The above discriminatory actions, conduct and adverse actions were taken by employees and the supervisory personnel within the VA in order to deprive the Plaintiff of employment and other employment benefits because of her sex.

131. The Defendant has intentionally and willfully undertaken and maintained the aforesaid discriminatory and unlawful practices, conduct and actions to the detriment of the Plaintiff.

132. The Defendant at all relevant times knew, or should have known, of the aforesaid discrimination against the Plaintiff.

133. The Defendant has failed to take necessary action to prevent or correct the complained of discrimination and, in fact, ratified such conduct.

134. The Defendant, through the Plaintiff's managers and supervisors has engaged in, directed or ratified conduct and denied and frustrated the Plaintiff's efforts to obtain relief under Title VII.

135. The Defendant, through acceptance of the complained of conduct, has fostered an attitude among supervisors at Bay Pines that discrimination based on sex is an acceptable employment practice.

136. Because of the willful actions of the Defendant and its administrators, managers and supervisors, and as a proximate cause thereof, the Plaintiff has been and continues to be denied her rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

137. As a result of the foregoing, the Plaintiff has been damaged. Those damages include, but are not limited to loss of employment; loss of pay; loss of benefits; loss of an amicable working environment; loss of career and professional opportunities; payment of attorneys' fees and legal costs; harm to professional reputation; physical illness and injury; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer these damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count II**
**(Hostile Work Environment based on sex)**

138. Plaintiff, Ann Spackman, sues Eric K. Shinseki, as the Secretary of Veterans Affairs, for hostile work environment based on sex.

139. Plaintiff incorporates and realleges paragraphs 1 through 126 and 129 through 137.

140. The aforesaid actions and conduct have created an intolerable hostile work environment.

141. As a result of the foregoing, Plaintiff has been damaged. Such damages include, but are not limited to loss of employment; payment of attorneys' fees and legal costs; loss of an amicable work environment; harm to professional reputation; physical illness and injury; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count III**
**(Retaliation)**

142. Plaintiff, Ann Spackman, sues Eric K. Shinseki, as the Secretary of Veterans Affairs, for retaliation under Title VII.

143. Plaintiff incorporates and realleges paragraphs 1 through 126.

144. Plaintiff engaged in EEO activity which is protected under Title VII.

145. The Defendant was aware of each of the Plaintiff's protected or EEO activities under Title VII.

146. The aforesaid adverse employment actions, adverse actions, misconduct and omissions; and other actions, conduct, and omissions to the Plaintiff's detriment were all taken (or failed to be taken) by administrators and managing and supervisory personnel with Bay Pines in retaliation for the protected or EEO activity of the Plaintiff.

147. As a direct and proximate result of protected or EEO activity, Plaintiff has suffered adverse employment actions and other adverse actions, including, *inter alia,* those set forth above.

148. Bay Pines has intentionally and willfully undertaken and maintained the aforesaid retaliatory and unlawful practices, conduct and actions to the detriment of the Plaintiff.

149. The Defendant at all relevant times knew or should have known of the retaliatory actions being taken against the Plaintiff.

150. The Defendant failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

151. The Defendant, through the supervisors, managers and administrators of the Plaintiff, has engaged in, directed, and/or ratified retaliatory conduct and has frustrated the Plaintiff's efforts to obtain relief under Title VII.

152. The Defendant, through acceptance of such conduct, has fostered an attitude among administrators, managers and supervisors at Bay Pines that retaliation against employees in order to discourage protected Bay Pines activity is an acceptable employment practice by administrators, managers and supervisors at Bay Pines.

153. Because of the willful actions of the Defendant and its administrators, managers and supervisors, and as a proximate cause thereof, Plaintiff has been and continues to be denied her right to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

154. As a result of the foregoing, Plaintiff has been damaged. Such damages include, but are not limited to loss of employment; loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputation; physical illness and injury; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count IV**
**(Retaliatory Hostile Work Environment)**

155. Plaintiff, Ann Spackman, sues Eric K. Shinseki, as the Secretary of Veterans Affairs, for retaliatory hostile work environment.

156. Plaintiff incorporates and realleges paragraphs 1 through 126 and 144 through 154.

157. The aforesaid actions and conduct have created an intolerable hostile work environment.

158. As a result of the foregoing, Plaintiff has been damaged. Such damages include, but are not limited to loss of employment; payment of attorneys' fees and legal costs; loss of an amicable work environment; harm to professional reputation; physical illness and injury; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer the same damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count V**
**(Discrimination based on disability)**

159. Plaintiff, Ann Spackman, sues Eric K. Shinseki, as the Secretary of Veterans Affairs, for hostile work environment based on disability under Title VII.

160. Plaintiff incorporates and realleges paragraphs 1 through 126.

161. As a direct and proximate result of the foregoing conduct and adverse actions, Plaintiff has been denied equal employment opportunity for wages, promotion, and other terms and conditions of employment by the Defendant because of disability. The aforesaid adverse employment actions, adverse actions, misconduct and omissions to the Plaintiff's detriment were all taken (or failed to be taken) by administrators and managing and supervisory personnel with Bay Pines because of Spackman's disability.

162. The above discriminatory actions, conduct and adverse actions were taken by employees and supervisory personnel within the VA in order to deprive the Plaintiff of employment and other employment action because of her disability.

163. The Defendant has intentionally and willfully undertaken and maintained the aforesaid discriminatory and unlawful practices, conduct and actions to the detriment of the Plaintiff.

164. The Defendant at all relevant times knew, or should have known, of the aforesaid discrimination against the Plaintiff.

165. The Defendant has failed to take necessary action to prevent or correct the complaint of discrimination and, in fact, ratified such conduct.

166. The Defendant, through the Plaintiff's managers and supervisors has engaged in, directed or ratified conduct and denied and frustrated the Plaintiff's efforts to obtain relief under Title VII.

167. The Defendant, through acceptance of the complained of conduct, has fostered an attitude among supervisors at Bay Pines that discrimination based on disability is an acceptable employment practice.

168. Because of the willful actions of the Defendant and its administrators, managers and supervisors, and as a proximate cause thereof, the Plaintiff has been and continues to be denied her rights to equal employment opportunity in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

169. As a result of the foregoing, the Plaintiff has been damaged. Those damages include, but are not limited to loss of employment; loss of pay; loss of benefits; loss of an amicable working environment; loss of career and professional opportunities; payment of attorneys' fees and legal costs; harm to professional reputation; physical illness and injury; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer these damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count VI**
**(Hostile Work Environment based on disability)**

170. Plaintiff, Ann Spackman, sues Defendant Eric K. Shinseki, as Secretary of the Department of Veterans Affairs.

171. Plaintiff incorporates and realleges paragraphs 1 through 126 and 161 through 169.

172. The aforesaid actions and conduct have created an intolerable hostile work environment.

173. As a result of the foregoing, the Plaintiff has been damaged. Such damages include, but are not limited to loss of employment; payment of attorneys' fees and legal costs; loss of an amicable working environment; harm to professional reputation; physical illness and

injury; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer these damages absent relief from this Court.

WHEREFORE, Plaintiff requests prospective relief, judgment for damages, attorneys' fees and costs, and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count VII**
**Failure to Reasonably Accommodate Disability**

174. Plaintiff, Ann Spackman, sues Defendant Eric K. Shinseki, as Secretary of the Department of Veterans Affairs for failure to reasonably accommodate a disability under Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (Rehabilitation Act) and Section 717 of the Civil Rights Act of 1964, as amended.

175. Plaintiff incorporates and realleges paragraphs 1 through 126 and 161 through 169.

176. Defendant has failed to reasonably accommodate Plaintiff's disability.

177. As a result of the foregoing, the Plaintiff has been damaged. Such damages include, but are not limited to loss of employment; loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable working environment; loss of career and professional opportunities; harm to professional reputation; physical injury and illness; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiff will continue in the future to suffer these damages absent relief from this Court.

WHEREFORE, Plaintiff requests reasonable accommodation, prospective relief, judgment for damages, attorneys' fees and costs and such other relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count VIII**
**Injunctive Relief**

178. Plaintiff, Ann Spackman, sues Defendant Eric K. Shinseki, as Secretary of the Department of Veterans Affairs.

179. Plaintiff incorporates and realleges paragraphs 1 through 177.

180. Unless the above practices are enjoined, Plaintiff will suffer irreparable harm.

181. There is: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless an injunction issues; (3) the threatened injury to the Plaintiff is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, is issued, will not disserve the public interest.

182. Plaintiff requests the Court award her attorneys' fees and costs and enter preliminary and permanent injunctions enjoining the following practices, actions and conduct:

a. Violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* as described above including retaliation against Plaintiff for protected or EEO activity and discrimination based on sex and disability.

b. Such other practices, actions or conduct that the court deems appropriate and proper to enjoin.

WHEREFORE, Plaintiff demands trial by jury of all issues so triable and such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff, Ann Spackman, hereby demands a trial by jury on all issues so triable.

Dated: July 8, 2013

Respectfully submitted,

Ward A. Meythaler
Florida Bar No.: 0832723
Merkle Magri & Meythaler, P.A.
5601 Mariner St., Suite 400
Tampa, FL 33609
Tel. (813) 281-9000
Fax.: (813) 281-2223
Email: wamsecy@merklemagri.com